# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

============================

## ON MOTION FOR REHEARING

============================

## NO. 03-05-00537-CR

**Brandon Burns Brewer, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT
NO. CR5574, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Our opinion and judgment issued on June 30, 2006, are withdrawn, and the following opinion is substituted.

Appellant Brandon Burns Brewer was convicted of murdering his mother, Nancy Brewer.[1] Tex. Pen. Code Ann. § 19.02 (West 2003). In his sole issue on appeal, Brandon contends that the evidence is factually insufficient to sustain his conviction, specifically referring to the jury's failure to find that he acted in self-defense. We will affirm the judgment of the district court.

_____

[1] For the sake of clarity, throughout the opinion we will refer to appellant as Brandon.

## BACKGROUND

The jury heard evidence that on the morning of May 21, 2004, the Llano County Sheriff's Office received information that a residence was on fire. Glenn Williams, an investigator with the sheriff's office, arrived at the scene. After the fire was extinguished, the body of Nancy Brewer was located in the burned residence. Williams testified that charcoal briquettes were found around the body. An autopsy performed on the body established that Ms. Brewer died of a gunshot wound prior to the fire. The fire was determined to have been the result of arson.

Amy Overstreet, an investigator with the sheriff's office, assisted Williams with the criminal investigation. Overstreet first interviewed Gary Brewer, Ms. Brewer's husband and Brandon's father, and she testified that Mr. Brewer suspected that Brandon was involved with Ms. Brewer's murder. Overstreet then interviewed Brandon. After questioning Brandon for approximately 90 minutes, she took a written statement from him.

In the statement, Brandon admitted shooting his mother but stated that he did so in self-defense. According to the statement, Brandon and his mother had been arguing for several months about her disapproval of his girlfriend. Brandon stated that the night before the incident he and his mother "talked and understood each other" and that they "fell asleep together on the bed holding hands." In Brandon's words, they were "mom and son again" and she was going to "stand by my side and let me date my girlfriend again." Brandon stated that the next morning he left school early and, on his way home, had called his mother and asked her to go to the house to get his "athletic papers." Brandon also stated that he had decided to meet his mother at home and surprise her with flowers. When she arrived, Brandon stated that she was "furious" and immediately began

2

yelling at him. Brandon was unsure why she was upset but stated that he believed "it was because I was able to come home early and she didn't know about it, [because] I was exempt from my last final." Brandon went on to explain that:

> While she was yelling she walked to me and shoved me against the wall and I hit my head. She went to the sink area of the kitchen and grabbed at least a fork and two knives. When I looked up she threw a fork at me but missed. So I jumped up and ran [through] her bathroom and slammed her door and ran [through] her bedroom and closed that door. I jumped over the couch in the living room and ran to Randall's room. I ran into that room and grabbed the [shotgun]. I knew the [shotgun] was in there because he told me to put it in there the day before. The gun was unloaded at the time. I ran back into the living room and grabbed a shell out of the pouch and loaded the gun. I could hear my mom coming and I was hoping once she saw the gun she would calm down and listen to what I have to say. I was in the living room at the table beside the glass door. She opened her bedroom door and I saw that she had a knife in each hand and they were steak knives that you eat with. She ran at me so I ran [through] the kitchen to [the] dryer and washer. That is by the door that she came in. As I ran [through] there I cocked the gun. I stopped by the dryer and washer, and I had the stock part of the gun under my arm. She continued to follow me and she followed me all the way to where she was between me and the door. At this point she only had one knife in one hand, her right hand. She pointed it at me and said "I am not her son anymore" and "I am not a part of the family anymore." Then she walked slowly to me and raised the knife, and as soon as she started coming down with the knife I pulled the trigger. I heard the gun go off. I saw [the bullet] hit her in the head, she [fell] by the door and that's when I blacked out.

Brandon was charged with one count of murder and one count of arson. Brandon was 16 at the time of the indictment and, because of the seriousness of the alleged offenses, the juvenile court waived its jurisdiction and ordered the case transferred to district court for criminal proceedings. The jury found him guilty of both arson and murder. Punishment was assessed at 30 years' confinement for arson and 60 years' confinement for murder. This appeal followed.

3

## DISCUSSION

When there is a challenge to the factual sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). When the issue of self-defense is submitted to the jury, we must also determine whether a rational trier of fact could have found against the defendant on that issue, that is, found beyond a reasonable doubt that the defendant's conduct was not justified. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference must be accorded the fact-finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed factually insufficient to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85; *see Johnson*, 23 S.W.3d at 11.

As a general rule, a person is justified in using deadly force in self-defense if he reasonably believes that deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force, and if a reasonable person in his situation would not

4

have retreated. Tex. Pen. Code Ann. § 9.32 (West 2003). A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996).

Whether Brandon reasonably believed that the use of deadly force was immediately necessary under the circumstances was a fact issue for the jury. *See Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). Brandon did not testify and, other than his written statement to the police, there is no evidence in the record that his mother attacked him. There is some evidence that Ms. Brewer suffered from emotional problems. Her co-worker, Maria Avila, testified that Ms. Brewer had previously taken antidepressant medication and that she suffered from "mood swings." Avila also testified that Ms. Brewer had told her about fights with her husband that would sometimes turn "violent." Avila also testified that Ms. Brewer did not approve of her son's relationship with his girlfriend because she had a criminal record and experimented with drugs. Avila elaborated that one time, after receiving a threatening voice-mail from his girlfriend, Ms. Brewer grabbed Brandon's shirt and "slapped the [expletive] out of him." Avila further testified that this incident caused Brandon to contemplate running away from home. However, other witnesses testified that Ms. Brewer appeared to be a good mother and part of a "good family" that got along well with each other.

There was also evidence in the record tending to disprove Brandon's version of the incident. For example, there was evidence that local investigators, DPS investigators, and a Texas Ranger carefully sifted through the debris in the residence yet never found any knives around the body. The jury also heard testimony that Brandon was "acting weird" after learning of his mother's

5

death and that he did not show "any type of emotion in crying or excitement." The State also introduced evidence that Brandon borrowed a 22 caliber weapon from a friend the morning of the murder and then left school early and, upon his return to school, lied to school officials and friends about where he had been and why he smelled of gasoline. Florence Hedge, a friend of the family, testified that she was with Ms. Brewer the night before she died and that Ms. Brewer was "nervous, shaking, and real scared" of Brandon.

Brandon's girlfriend Lynn Arney testified that Ms. Brewer was a "really caring" woman and that Brandon and his mother "seemed to get along very well." Arney also testified that she and Ms. Brewer "always got along" but admitted on cross-examination that Ms. Brewer did not want her seeing Brandon because Ms. Brewer believed Arney was influencing Brandon "in a negative way." Arney claimed that she had a "really great relationship" with Ms. Brewer and that she treated her "like a daughter." According to Arney's testimony, she and Ms. Brewer mutually agreed that she and Brandon should stop dating. Arney testified that this was hard for Brandon to accept and that he threatened to kill himself.

Arney also testified that, on the day of the murder, Brandon visited her at her house and told her that they "can be together now and that she was out of the way." Arney testified that she "had no idea what he meant by that" and that she was "rather frightened." Arney further testified that immediately after he told her that, they took a bath together, and the day after his mother died, Brandon proposed marriage to her.

Considering all of the evidence in a neutral light, we hold that the State's evidence of guilt was not so weak and the evidence Brandon cites as justification for his conduct was not so

6

strong as to preclude a rational jury from finding beyond a reasonable doubt that appellant's use of deadly force was not justified.  We overrule Brandon's sole issue on appeal.

## CONCLUSION

Having overruled Brandon's only issue on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed:   July 28, 2006

Do Not Publish